HERBERT A. WAGNER, Appellant, v. THE EDISON ELECTRIC ILLUMINATING COMPANY OF CARONDELET, Respondent.

St. Louis Court of Appeals, July 20, 1909.

1. IMPLIED CONTRACT: Services Rendered: Instruction. Plaintiff represented two companies on a committee composed of the representatives of several companies, the duties of which were to install conduits for the joint use of said companies. This committee appointed plaintiff engineer, and as such he performed services for said companies, which were different and distinct from his duties as a member of said committee, without any express agreement for compensation. In an action on a *quantum meruit* against one of the companies he did not represent on said committee *for its proportion of the reasonable value* of said special work, an instruction which authorized the jury to find for defendant if it did not know, or have reason to believe, *from the committee's employment of plaintiff as engineer*, that it was expected to pay for such services, is erroneous, for the reason defendant's liability should be determined with reference to the character and amount of the services rendered, and not with reference to the mere fact of appointment by the committee to perform the services.

Wagner v. Illuminating Co.

2. ————: ————: **Strangers.** Where one person employs another to do any work for him, the law implies that the former undertook to pay the latter as much as his labor deserved. This rule obtains between strangers only—that is, where no relation exists to give rise to a contrary presumption.

3. ————: ————: **Express Contract.** On principle, a contract which the law implies is one which the parties have not made; for if they have made an actual contract, there is no room for implication by the law.

4. ————: ————: **Close Relationship of Parties: Presumption.** Where the relationship of the parties is such as to lead a reasonable person to believe the services are rendered gratuitously, the presumption is, they are not to be recompensed, and the burden of overcoming this presumption rests upon the party asserting the claim.

5. ————: ————: ————: ————: **What Showing Necessary to Overcome Presumption: Case Stated.** Plaintiff represented two companies on a committee composed of the representatives of several companies, the duties of which were to install conduits for the joint use of said companies. This committee appointed plaintiff engineer, and as such he performed services for said companies, which were different and distinct from his duties as a member of said committee, without any express agreement for compensation. In an action on a *quantum meruit* against one of the companies he did not represent on said committee for its proportion of the reasonable value of said special work, in order to recover it was incumbent on him to show that he performed the services; that he intended to charge for them at the time; and that defendant either intended at the time to pay for them, or that they were of such a character and were performed under such circumstances as to raise the presumption that the parties intended they were to be paid for, or at least that the circumstances were such that a reasonably prudent man ought to know that compensation would be expected.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough,* Judge.

REVERSED AND REMANDED.

*Lyon & Swarts* and *Dwight D. Currie* for appellant.

The circuit court erred in giving, at defendant's request, instruction IV. Wagner v. Electric Co., 177 Mo.

44; Taussig v. Railroad, 166 Mo. 28; Construction Co. v. Fitzgerald, 137 U. S. 98; Pew v. Bank, 130 Mass. 395; Bassett v. Fairchild, 137 Cal. 637.

*Judson & Green* for respondent.

(1) This case has been before this court and the Supreme Court of Missouri on former appeals, and both of those courts have held, under the same evidence which was submitted to the jury in this case, that appellant was appointed supervising engineer by the committee which was the agent for that purpose of all the companies. Wagner v. Electric Ill. Co., 177 Mo. 44; s. c. 82 Mo. App. 287. (2) Appellant's second contention is, that the instruction is erroneous in that it required the jury to find that the defendant did not, at the time the committee employed appellant as supervising engineer, intend to pay him for his services as such engineer, appellant's argument being, that it was immaterial what defendant's intention in this matter may have been. If appellant is correct in this contention, the only effect of this error was to require respondent to prove an unnecessary fact, and was an error favorable to appellant and prejudicial to respondent if to anyone. The law is well settled that, an appellant cannot complain of an error which must in its nature have been prejudicial only to the successful party. Prewitt v. Railroad, 134 Mo. 615; Wright v. McPike, 70 Mo. 175; York v. Bank, 105 Mo. App. 127. (3) Even if this instruction was not technically correct the court gave appellant's instructions in the form in which he asked for them, presenting clearly and explicitly appellant's theory of the case, and the instructions, taken as a whole, could not have been misleading. In such cases, the judgment of the trial court is always affirmed. Jones v. Poundstone, 102 Mo. 240; Sullivan v. Railroad, 133 Mo. 1; Scotland Co. v. O'Connell, 23 Mo. App. 165.

STATEMENT.—This is a suit *quantum meruit* in which plaintiff seeks to recover the reasonable value of his services as engineer rendered the defendant in supervising the construction of a conduit in the city of St. Louis. Upon a trial before a jury, the finding and judgment were for defendant and the plaintiff appeals. The facts out of which the controversy arises are highly complicated and require an extended statement. The counsel for respondent concede the statement of facts as prepared and printed by appellant's counsel in the briefs to be entirely fair and just. Upon investigating the case, we believe no more accurate statement thereof can be made than that referred to. We therefore adopt appellant's statement of facts, as follows:

"Ordinance No. 18690 of the City of St. Louis, known as the 'Keyes' ordinance, required that all the electric lighting and power companies doing business within the district bounded by the river and Twenty-second street, Wash and Spruce streets, to bury their wires under ground and forbids the use of poles, etc., above ground within said territory after December 31, 1898. This ordinance provided for certain privileges to persons and companies complying with its terms, and the defendant and the several companies hereinafter named qualified under the ordinance.

"The general plan of construction contemplated by the ordinance was for conduits, through which passed ducts, or pipes to be built under the surface of the city streets, under the superintending control, as to location, etc., of the Board of Public Improvements.

"Where the plans presented by different companies to the Board of Public Improvements contemplated a use by all of the same streets or alleys the Board had the power to compel the applicants to build and maintain joint conduits with the right, if the companies disagreed, to apportion the costs.

"Under a contract dated April 17, 1897, providing for the joint construction of underground conduits as required by the Keyes Ordinance, and entered into between the following companies and the National Conduit Company of St. Louis, viz.:

"The Missouri Electric Light & Power Company, the St. Louis Electric Light & Power Company, the Phoenix Light, Heat & Power Company, and the Edison Electric Illuminating Company of Carondelet, it was provided among other things, for the formation of a construction committee to be composed of one representative of each of the above companies.

"In accordance with said provision, the following gentlemen met by appointment at the office of the Laclede Gas Light Company, on April 30th, at three o'clock p. m.:

"Herbert A. Wagner, the plaintiff herein, representing the Missouri Electric Light & Power Company; D. W. Guernsey, representing the St. Louis Electric Light & Power Company; A Ross, representing the Phoenix Light, Heat & Power Company; E. V. Matlack, representing the Edison Electric Illuminating Company of Carondelet, the defendant herein, and having shown that they were duly authorized to represent their respective companies organized by electing Mr. Wagner chairman, and Mr. Ross, Secretary, of the committee.

"This committee was known as 'The Joint Conduit Construction Committee.'

"One of the rules adopted by this Joint Conduit Construction Committee provided that no motion should be carried unless it received three votes in the affirmative. At a meeting of this committee, held on May 7th, 1897, Mr. Ross moved that Mr. Wagner, the plaintiff, be appointed engineer to supervise the underground work as provided in the contract entered into on April 17th, 1897, between the National Conduit Company of St. Louis and the companies represented on the com-

mittee.    The motion was seconded by Mr. Guernsey; all voted aye except Mr. Matlack, the Secretary of the defendant, who voted no.    Mr. Wagner was declared duly appointed engineer.

"In the meeting of the Joint Conduit Construction Committee, held on May 8th, 1897, a motion providing for the appointment of a sub-committee to report upon a plan of defining the duties of the engineer was passed.    Mr. Guernsey, temporary chairman, appointed Matlack, Wagner and Ross.    Wagner and Ross submitted a majority report, and Matlack submitted a minority report at the same meeting at which they were appointed.

"On May 11th, 1897, the sub-committee withdrew the majority and minority reports, and presented the following report:

" 'St. Louis, May 11, 1897.

" 'The engineer shall provide all plans and submit same for the approval of the committee, may obtain all necessary permits from the Board of Public Improvements, after acceptance by the companies of the finding of the Board, and shall make requisitions upon the other companies for their proportion of the deposit to be made with the city and for their proportion of the cost of preparing plans.    He shall have general supervision of the work as provided in the contract entered into April 17, 1897; he shall make a detailed weekly report in triplicate to the committee which shall show the amount of joint work accomplished; he shall consult freely with the engineers of the companies and all disputes between them shall be referred to the committee for adjustment.    He shall certify all contractors' bills in ample time for the committee to draw same for payment as provided in the contract; each company shall appoint, subject to the approval of the committee, its *pro rata* of inspectors or draftsmen as may be required for the general engineering force, who may be removed upon complaint of the engineer and the action

of the committee. Each company shall pay its inspectors, but they shall be subject to the direction of the engineer. The *pro rata* of inspectors, etc., to be furnished by each company shall be approximately as follows: The Missouri Electric Light & Power Company, seven-twelfths; Phoenix Light, Heat & Power Company, two-twelfths; Edison Illuminating Company of Carondelet, two-twelfths, and this proportion may be changed by the action of the committee should it be deemed advisable.

" 'HERBERT A. WAGNER,

" 'E. V. MATLACK,

" 'A. ROSS.'

"This report was unanimously adopted.

"On motion of Mr. Matlack, made in a meeting of the Joint Conduit Construction Committee, held May 11th, 1897, the following letter was sent to the Board of Public Improvements, and by it received in due course:

" 'St. Louis, Mo., May 11, 1897.

" 'To the Honorable Board of Public Improvements of the City of St. Louis:

" 'Gentlemen: The undersigned companies have appointed Mr. Herbert A. Wagner, engineer, for the construction of their conduits under authority of Ordinance No. 18680. You will please deliver permits for conduits to him or his order.

" 'Very Respectfully,

" 'MISSOURI ELECTRIC LIGHT & POWER CO.,

" 'EDISON ILLUMINATING CO. OF ST. LOUIS,

" 'THE ELECTRIC LIGHT, POWER & CONDUIT CO.,

" 'S. P. PIKE, Secretary,

" 'PHOENIX LIGHT, HEAT & POWER CO.,

" 'A. ROSS, President,

" 'EDISON ELECTRIC ILLUMINATING COMPANY OF CARONDELET.

" 'E. V. MATLACK, Secretary,

" 'ST. LOUIS ELECTRIC LIGHT & POWER CO.

E. W. GUERNESEY, President.

"The contract heretofore mentioned and entered into on the 17th day of April, 1897, between the National Conduit Company of St. Louis, the National Conduit & Cable Company and the Abbott-Gamble Contracting Company, as contractors, and the Missouri Electric Light & Power Company, The Phoenix Light, Heat & Power Company, the St. Louis Electric Light & Power Company and the Edison Electric Illuminating Company of Carondelet, provided that all disputes between the parties to the contract should be referred to the Joint Conduit Construction Committee, and the committee's decision was to be final.

"The contract also provided that many questions regarding the policy to be followed in laying and constructing the conduits and material to be used therein, the way in which it was to be used, and many other details of the work were to be done under the direction of the engineer and according to his direction, and were to meet with his approval. Before acceptance of the work or any section thereof the condition of all work and material was to be ascertained by the engineer, and any conduit which should be found defective by the engineer was to be replaced at once with perfect work by the contractors at their expense. The money to be paid under the contract was paid under the direction of the committee.

"Under authority of the letter to the Board of Public Improvements, dated May 11, 1897, heretofore set out, the Supervisor of the City Lighting, delivered to Mr. Wagner or his representatives, permits for the building of conduits on various streets and alleys. These conduits were being built by the Companies signing this letter. The method which was followed by these companies before the Supervisor of City Light issued the permit was as follows: The first act was the filing of general plans by the different companies showing the route and the number of ducts they wished to construct, and the several streets within the under-

ground district. Then following that the Board of Public Improvements prepared and issued plans giving the number of ducts that would be required for each Company in the construction of a joint conduit on certain designated streets or alleys within the underground district. The companies were required within a certain limited time to file an acceptance of those findings and make certain deposits with the City Treasurer covering the cost of the excavation permits, and guaranteeing the restoration of the surface of the streets. Following that, detailed plans were submitted and adopted by the Board as the joint conduit plans. Following that, the permits were issued.

"Plaintiff is a consulting engineer for electrical construction. Previous to 1897, he had been for a number of years with the Missouri Electric Light & Power Company, and also for some time with the Edison Electric Illuminating Company of St. Louis as electrical engineer and as superintendent. After the motion was made and voted on in the joint committee for conduit construction, appointing Wagner engineer for supervision of the underground work, he accepted that position and thereafter acted as supervising engineer for joint conduit work for the interests represented in the conduit construction committee. In such capacity he prepared plans for all conduit work after the findings of the Board of Public Improvements had been made. These plans showed the size of the conduits, and all details as to size and location of manholes, service boxes, depth of conduits below the streets, distance from curbs, and methods of avoiding obstructions in the streets, such as sewer and water pipes and gas pipes. These plans were then submitted by plaintiff to the Board of Public Improvements and permits were issued. He or his representative obtained these permits from the Board of Public Improvements, and the contractor was ordered by him to begin work on the part of the street covered by permits. He supervised this

work and directed all of it personally or through representatives. He made weekly reports to the conduit construction committee, and monthly estimates of the amount of work done for each company by the contractor and the proportionate cost to each company for the work done, and estimates based on these reports were made upon each after their approval by the committee, on which the contractor based his bills for the work to the various companies. He represented the companies in all their dealings in connection with the contractors, and gave all orders to the contractors. The inspectors were under his charge, as were also the draftsmen. The drafting force consisted of a number of draftsmen who made the detailed plans after the findings of the Board of Public Improvements, and permits were issued on those detailed plans. There were a great many plans made, and each company had to have a copy of each plan made. The blanket plans which were filed by the companies showed the streets on which the company expected to build conduits and the probable maximum number of ducts; which each company would require on each street. The conduits actually built differed very considerably from the number of ducts shown in the blanket plans. In the actual construction work, the location of the conduits in the street and the depth to which they would be sunk was supervised by plaintiff or done under his direction. These details were not shown in the blanket plans prepared by the Board of Public Improvements. These details were worked out by plaintiff, and in doing so it was necessary first to consider the findings of the Board of Public Improvements to determine the number of ducts allotted to each Company and the side of the street on which the conduits were to be constructed. After that it was necessary to determine as nearly as possible the obstructions which were liable to be encountered under the surface of the streets. For that purpose it was necessary to consult all the records in the Street De-

partment and Sewer Department to determine the location of sewer, gas and water pipes, and very often it was necessary to make plans to show these locations. From these plans the draftsmen, in making plans for the conduits, would determine about what part of the street to put the conduit in. Test holes often had to be dug in the street to determine the location of obstructions which were not accurately shown by the maps. In all there were prepared under plaintiff's direction about three thousand plans. The estimation and measurement of the work was done under his direction. Before the contractors could be paid 'it was necessary for him to measure the conduit work completed and determine its cost and apportion the cost between the different companies in proportion to the number of ducts which each Company was entitled to in the conduit in question. There were weekly and monthly reports. The estimates of the cost were made monthly. The weekly reports referred to details of construction, and the size of manholes and the location of service boxes to connect customers with the conduit. This work took practically all of plaintiff's time during the period of construction, it was outside of his duties as chairman of the Joint Conduit Construction Committee, and required his presence a great deal of the time on the trench. Besides the work on the trench, there was a great deal of office work connected with the drafting. The drafting was done in the rooms of the Missouri Electric Light Company. There were between five and seven draftsmen under plaintiff's direction. As a rule, there were about three inspectors to each gang of men which the contractor was working, and the number of gangs varied from time to time, and the number of inspectors probably varied from eighteen to twenty. Besides making reports plaintiff discussed very frequently in the presence of Mr. Matlack the work that was being done by himself and under his supervision. The cost of the work done by the companies represented

on the conduit construction committee from May 7th, 1897, to May 7th, 1898, amounted to between $200,000 and $250,000. Almost all of the time the defendant was interested in the work done under plaintiff's supervision. Of course there were times when there was more work being done than at others, but during the entire period in question there was always work in the draft- ing room, or on the construction of conduits being done by the engineering force of the Edison Electric Illuminating Company of Carondelet which plaintiff supervised. The defendant did, during the time in question, about $50,000 worth of work.

"Plaintiff represented on the Committee three companies, the Missouri Electric Light & Power Company, and the Missouri-Edison Electric Company, which were practically one at that time, and then there was a third company which was frequently mentioned, the Electric Light, Power & Conduit Company. The stock in all these three companies was held by the same interests, and the amount of work done by the companies plaintiff represented on the committee was, prior to the 7th day of May, 1898, about one-half of the total amount done. Eventually it was more than one-half, but during the year in question it was about one-half. These three companies were consolidated shortly after this work commenced. They were consolidated under the name of the Missouri-Edison Electric Company, and in that consolidation the company represented on the committee by Mr. Guernsey was not taken in, until about a year afterwards.

"The Company represented by Mr. Guernsey did a small amount of work, having constructed a conduit on Lucas avenue. This company was the St. Louis Electric Light & Power Company.

"Previous to the time this joint construction work commenced, plaintiff had held the position of General Superintendent with the Missouri Electric Light & Power Company and the Edison Electric Illuminating Com-

pany of St. Louis. He held this position with the Missouri Company for a number of years, and for a year' or more with the other company. At the beginning of the year 1897, he was receiving $250 a month from one company and $200 from the other company. He received the same salary from these companies during the period of joint construction, but for quite different duties. Nominally his position did not change, but the work that they had been doing prior to the time of the joint construction—that is, the erecting and construction of two large electric light plants—required most of his time. During the period of joint construction he did not render any bill to these companies for services because they simply paid him a salary on an understanding he had with the President of the company. He did not make any specific charge against those companies that he represented on the Committee for services rendered them as engineer of joint construction, because he had a definite understanding with their President that he was to receive so much a month for his work, and he was to receive as their proportion of the work done on the conduit the same amount he had received for other work that he had done prior to this period. Plaintiff received nothing as engineer of joint construction from the St. Louis Electric Light & Power Company, represented by Mr. Guernsey. He never presented any bill to that company, but he rendered Mr. James Campbell some other services, and in payment of this bill the other service to this company was included. That was about the time he rendered his bill to the defendant Company, and after it was known that Mr. Campbell controlled the St. Louis Electric Light & Power Company.

"Plaintiff rendered a bill to the Phoenix Company for $1,000 covering the same period as that covered by the bill which is the basis of this suit, and it was paid promptly. The amount for work that he did for the

Phoenix was less than he did for the Edison Electric Illuminating Company of Carondelet.

"Plaintiff testified that he always intended to charge defendant for his services as supervising engineer. He made such a statement at several meetings of the Joint Conduit Construction Committee, at which Mr. Matlack, the secretary of defendant and its representative on that committee, was present.

"The following letter was sent by the defendant's president to the Supervisor of City Lighting:

" 'Edison Electric Illuminating Company of Carondelet.

" 'St. Louis, July 24, 1897.
" 'Hon. A. J. O'Reilly,
    Supervisor of City Lighting,
        City Hall.

" 'Dear Sir: In answer to yours of the 20th instant, please return to me my communication of July 19th, 1897, and consider same as withdrawn. We understand your suggestion that in work of an engineering nature the Board will recognize the engineer. The engineer was appointed by this company in conjunction with other companies doing conduit work jointly for the purpose of preparing for the Company's approval detailed plans of the work to be done and of supervising the actual work. A joint letter was sent to the Board of Public Improvements May 11th, 1897 by the companies, informing the Board of this appointment and requiring the Board to deliver permits for conduits to the Engineer or his order. This appointment does not carry with it any power to the Engineer to represent the companies at the Board. This company for various reasons, reserves to its President or Secretary, the right to represent its interests before the board.

" 'Yours truly,
        " 'HENRY C. SCOTT,
                " 'President.'

"Matlack testified that at the time of the discussion in the joint conduit committee as to the appointment of an engineer, there was nothing said by anybody in reference to the engineer making a charge against the interested companies. The matter was discussed in the presence of Mr. Wagner, and it was suggested by him (Matlack) that in order to get a man who would not be interested in any of the competing companies and who would occupy an unbiased position, that they employ some one outside, but objection was made that it would cost some money to do that and that they might save that expense.

"Matlack testified also that he told Mr. Wagner, in response to some proposition of his, that the Missouri-Edison Company would do certain parts of this work, that defendant would not agree to the Missouri-Edison doing any work for it without a written order, and that in doing that work it would do its share of it in service, but would not pay anything whatsoever, but would do its proportion of the work, but would not employ a competitor to do its work and pay him for it.

"Matlack testified that his company engineered and supervised this joint conduit construction work just as though there had been no other ducts in it except its own. That it had a special engineer who was constantly on the work. That he was on the work frequently and his company had the corps of inspectors which were paid by it, but as a matter of convenience the work was nominally under the control of Mr. Wagner or under the control of the Missouri-Edison people. He inspected the plans, and a number of them were changed by reason of his inspection of them, and they were all signed by him personally for his company, approving of them, and these matters which were brought out in the committee were all passed upon and the different engineering features necessary, which were very slight, were gone over in that way.

141 App.—5

"Matlack testified that his company did not rely upon the supervision and inspection of Mr. Wagner to any extent whatever; defendant did as much inspection as if he had not been there; in fact, a little more, for the reason that where interests of the different companies conflicted in a given conduit or service box or manhole, it could not be sure that its interest would be safeguarded.

"Matlack testified also that whenever the matter of Wagner charging for his services came up for discussion before the committee, that he always stated plainly that his company would not pay anything; that it would furnish its *pro rata* of the services; that it did not need any engineer or inspector; that it would not pay any bill whatever for anything that the other companies did for it, and if they did anything of the kind it was because they considered it part of their work and not part of defendant's work.

"The plaintiff and three or four electrical and consulting engineers testified that the charge made by plaintiff, to-wit, $100 per month, was reasonable. No evidence to contradict this was offered by defendant."

NORTONI, J. (after stating the facts.—Among others, the court gave the following instruction on behalf of the defendant:

"The court instructs the jury that although they believe from the evidence that plaintiff may have intended at the time he was selected as supervising engineer to charge defendant for such services as he might render it, yet if the jury further believe from the evidence that he did not disclose said intention to this defendant at the time or before his selection by the committee as engineer, and the defendant did not then know or have reason to believe from the committee's employment of him as engineer that it was expected to pay him and did not intend to pay him for such services and that defendant notified plaintiff that it did not intend to pay

him for said services as soon as it learned that plaintiff intended to charge therefor, plaintiff is not entitled to recover."

The jury having found the issues for defandant, plaintiff prosecutes the appeal, and assigns the giving of this instruction as the only error complained of.

The evidence shows that plaintiff was appointed as engineer by the committee on joint conduit construction. That this appointment originally made by the committee was subsequently ratified or confirmed by the defendant company is obvious from the letters hereinbefore set out and other uncontroverted facts in proof. However this may be, throughout the case the defendant has insisted that the plaintiff did not intend to charge it for his services; that although plaintiff's services were to be compensated by the two companies he represented, they were gratis to this defendant. Defendant's theory of the case is that as plaintiff was in the employ of two other companies and represented them on the committee for joint conduit construction, he merely performed such services as were incident to that employment by the two companies which he represented, and that therefore he is not entitled to recover from the present defendant any more than Hr. Matlack, the representative of this defendant on the joint committee, would be entitled to recover from the other companies for his services rendered in that behalf. The instruction referred to submitted to the jury that although they found from the evidence plaintiff may have intended to charge for his services at the time of his selection by the committee, yet if it also found that plaintiff had not disclosed his intention to charge to this defendant, and the defendant did not know, or have reason to believe, *from the committee's employment of him that it was expected to pay,* and further found that defendant in fact did not intend to pay for his services, and that it notified plaintiff of such inten-

tion on its part, as soon as it discovered he intended to charge, then plaintiff should not recover.

The first criticism leveled by the plaintiff against this instruction is that it authorized the jury to find the issues for defendant if it did not know, or have reason to believe, from the committee's employment of plaintiff as engineer, that it was expected to pay for such services. It is argued, although defendant may not have known from the committee's employment of the plaintiff an engineer that it was expected to pay him for his services, nevertheless plaintiff is *prima facie* entitled to a verdict on that score, if, by looking to all of the facts and circumstances of the case and the amount and character of the services rendered, the defendant, as a reasonable person, should have known that it was expected to pay therefor. That is, by looking at the character of the services rendered by the plaintiff, defendant might have known that such services were not those incident to plaintiff's office as a member of the committee alone, and were of such a character that a reasonable person who receives the benefit thereof, would expect to be called upon to compensate. There can be no doubt the instruction pointing the jury to what the defendant knew, or had reason to believe alone from the committee's employment of plaintiff as engineer, was inaccurate, for the reason the defendant's conduct in respect of this matter, should be determined rather by reference to the character of the services rendered than to the mere fact of appointment by the committee to perform the services. This for the reason that in respect of such matters, the law presumes certain services are to be furnished gratis; that is, as an officer of the joint committee on conduit construction, plaintiff owed to defendant as well as to all the other companies who were parties to the arrangement, certain services free of charge, for they were all acting together. In respect of these matters, each company furnished a man on the joint committee. The

services of the several members of the joint committee
were furnished to all of the companies in consideration
of the services of every other member of the committee.
Therefore this defendant had the right to expect the
services of plaintiff on the joint committee to be per-
formed gratis to it as a recompense for the services of its
agent, Mr. Matlack, on the same committee. However,
this may not be true in respect of those more arduous
services performed by plaintiff, which were different
and distinct from those of a member of the joint com-
mittee. If the character and amount of those services
were such as to lead a reasonable person to believe they
were not being performed gratis and that compensa-
tion would be expected therefor, then the law will imply
a promise to pay the reasonable value of the serv-
ice rendered. The question should be determined by
reference to the character and amount of the service
rather than from the mere employment of plaintiff
by the committee and in this respect, the instruction
was inaccurate.

It is said the instruction is erroneous for the fur-
ther reason that it required the jury to find, among
other things, either that the defendant intended to pay
plaintiff or that the services rendered by him were of
such a character that defendant should have had rea-
son to believe that it was expected to pay for them.
The argument advanced is that if the plaintiff per-
formed valuable services for the defendant and intend-
ed at the time to charge therefor, defendant having vol-
untarily accepted the same, the law implies a promise
on the part of the defendant to pay the reasonable
value thereof; and this, too, notwithstanding the mat-
ter of its intention in that behalf. Now, Sir William
Blackstone, in speaking of this matter generally, says
the law implies a promise in such circumstances to pay
and raises a presumption which proceeds from reason
and justice to that end. "And if I employ a person to
do any business for me, or perform any work; the law

implies that I undertook, or contracted to pay him as much as his labor deserved. If I take up wares from a tradesman without any agreement on prices, the law concludes that I contracted to pay their real value." [2 Blackstone's Comm., 443.] The rule just quoted from Blackstone is that which obtains between strangers. That is, where no relation exists affording a presumption to the contrary. Of course there can be no actual contract in any case except there be present the intention of both parties. That is to say, there must be a mutual meeting of the minds, in order to constitute an actual contract. Therefore, on principle, a contract which the law implies is one which the parties have not made; for if they have made an actual contract, by each intending and agreeing upon the same proposition, there is no room for implication by the law. [Weinsberg v. St. Louis Cordage Company, 135 Mo. App. 553, 116 S. W. 461; Hertzog v. Hertzog, 29 Pa. St. 465; 7 Amer. and Eng. Ency. Law (2 Ed.), 91, 92; Fitzpatrick v. Dooley, 112 Mo. App. 165.] Now one person may render valuable services to another, intending at the time to charge therefor. The other person, for whom the services are rendered, may accept them and at the same time intend not to pay. Of course, in such circumstances, there is no actual contract between the parties for the reason there is a want of mutual intention. However the law will presume in those circumstances, between strangers, that the person receiving the services shall pay the reasonable value thereof. This presumption is dictated, of course, by reason and natural justice. Such is an appropriate and typical case of a contract implied by law for the sake of the remedy it affords. [Weinsberg v. Cordage Co., 135 Mo. App. 553, 116 S. W. 461.] The presumption afforded by the law under such circumstances obtains only between strangers, however; that is to say, it is not present in those cases where the peculiar relations of the parties are sufficient to dictate that in accordance with the principles

of reason and justice, the presumption should be otherwise. [1 Beach, Modern Law of Contracts, sec. 650; Smith v. Meyers, 19 Mo. 434; Fitzpatrick v. Dooley, 112 Mo. App. 165.] When the relationship of the parties is such as to lead a reasonable person to believe the services are performed gratis, then the presumption is that they are not to be paid for and the burden rests with the party asserting the claim to overcome the presumption. For instance, in the family relation, the services rendered by a child to the parent are presumed, on account of the ties of filial affection, etc., to have been rendered gratis. And although the services were requested and received by the parent and of great value, the presumption of law obtains to the effect that no recompense is to be made therefor. The presumption, of course, is disputable, and may be overcome by a showing of fact to the contrary. [Fitzpatrick v. Dooley, 112 Mo. App. 165; Smith v. Meyers, 19 Mo. 434; Cowell v. Roberts, 79 Mo. 218; 1 Beach, Modern Law of Contracts, sec. 653.] The principle is not confined to the family relation. It finds appropriate application as well in all cases where the relations of the parties are sufficient, according to the experience and customs of men, to invoke its influence as a result of reason and natural justice. For instance, the officers of incorporated companies, such as bank presidents and cashiers, are expected, of course, to perform all necessary services to the bank, incident to the office they hold in consideration of the salary they receive for executing such offices. In view of this relation, the law presumes generally that all services performed by such officers are performed by them in the capacity and as within the duties of the particular office they occupy. [Sawyer v. Pawners' Bank, 6 Allen (Mass.) 207; Taussig v. Railway, 166 Mo. 28; Pfieffer v. Sandberg Brake Co., 44 Mo. App. 59.] Now in view of this presumption, which attends the services rendered to an institution by one who is an officer thereof, it is not sufficient for such of-

ficer to show merely that he preformed valuable services other than those pertaining to his particular office at the request of the defendant, and that he intended to charge therefor at the time, and the defendant received the services; for the law presumes such services are rendered gratuitously, or at most, for the same compensation received in respect of his particular office; and the defendant has the right to rely upon such presumption unless plaintiff shows more. That is to say, in such circumstances it is incumbent on the plaintiff to show not only that he intended to charge, but he must show as well a state of facts which will overcome the presumption referred to and sufficient to lead a reasonable person to believe that he would be expected to pay for the services. Although upon such a showing the court or jury may not be authorized to find that defendant actually intended to pay, it may find that the party thus receiving the benefit is estopped to deny that he intended to make reasonable compensation, for, to the extent mentioned, in the spirit of justice, the law implies a promise to pay the reasonable value of the services rendered. Of course, what has been said in no manner curtails the right of the plaintiff to show if possible that he intended to charge and that the defendant intended to pay; that is, to show an actual contract as contradistinguished from one implied by law. In cases circumstanced as this one, the result of the authorities is that it is incumbent upon the plaintiff to show that he performed the services; that he intended to charge for them at the time; and that the defendant either intended at the time to pay for them (in which case, of course, there is an actual contract arising from the mutual intention of the parties) or that the services were of such a character and were performed under such circumstances as to raise the presumption that the parties intended they were to be paid for, or at least that the circumstances were such a reasonable man in the same situation with the person who receives and is

benefited by the services, ought to understand and know that compensation would be expected from them. This is the doctrine of our Supreme Court asserted in this identical case on a former appeal. [Wagner v. Edison Electric, etc., Co., 177 Mo. 44, 63, 64.] For the leading and best considered authorities on the subject, see Sawyer v. Pawners' Bank, 6 Allen (Mass.) 207; Pew v. Gloucester Natl. Bank, 130 Mass. 391; Fitzgerald Const. Co. v. Fitzgerald, 137 U. S. 98, 112; Bassett v. Fairchild, 132 Cal. 637; Taussig v. Railway, 166 Mo. 28. Now it is true that plaintiff was not an officer of the defendant company in the first instance. Nevertheless as a member of the joint committee on conduit construction, he assumed certain duties and obligations to this defendant and all the other companies whose interests converged in that committee. That is to say, the relation of plaintiff to defendant and each of the other companies, except the particular company which he represented because of his committee assignment, was such as to afford a presumption upon which the different companies, other than the companies which he particularly represented, may rely that such services as were rendered by plaintiff were performed gratis to them, in consideration of such services as were being rendered by the particular agent of each other company on the same committee. In other words, the defendant had the right to presume that the services rendered by the plaintiff were gratis to it, unless it knew plaintiff intended to charge and it intended to pay him for the same in which case there was, of course, an actual contract because there was a meeting of the minds to that effect, or unless the plaintiff intended to charge for his services, and the services rendered as engineer, aside from his office as a member of the committee, were rendered under such circumstances as to raise the presumption that the parties intended and understood they were to be paid for, or that the character of the service and the circumstances under

which they were rendered, were such that a reasonable man in the same situation, would and ought to understand that compensation was to be made for them.

The instruction above set out treated with the matter of defendant's actual intention well enough; but it failed to express the true rule touching the constructive contract or promise to pay implied by law. That is, it did not authorize a finding for the plaintiff if the character of the services and the circumstance attending the employment and service were such as to lead a reasonable person to believe that compensation would be expected from him therefor. Besides, the rule declared by this instruction is entirely inconsistent with other instructions given on behalf of the plaintiff.

For the reasons above pointed out, the judgment will be reversed and the cause remanded. It is so ordered. *Reynolds, P. J.,* and *Goode, J.,* concur.